**In re Samuel W. HORNER, Debtor(s).**

**Connie OVERTON, Plaintiff,**

v.

**Samuel W. HORNER, Defendant.**

**Bankruptcy No. 90–00106–JKF.
Adv. No. 90–0178–JKF.
Motion No. 90–2895–M.**

United States Bankruptcy Court,
W.D. Pennsylvania.

April 12, 1991.

---

C.E. Kurewski, M.E. Kusturiss & Associates, Canonsburg, Pa., for debtor/defendant.

Sanford M. Aderson, Aderson, Frank & Steiner, Pittsburgh, Pa., for plaintiff.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

Before the Court are two matters brought by Connie Overton, the former wife of the Debtor. Ms. Overton seeks relief from stay so that she can pursue defaults in what she categorizes as "spousal maintenance" and requests a determination that the Debtor's obligation to her is nondischargeable.

The testimony of the Debtor established that the parties were married in the early months of 1984 and had no children. Ms.

Overton left the marital residence for a vacation in October, 1988, returned in December, 1988, for some personal items, and left again. The parties remained separated until their divorce.

Debtor filed for divorce on January 2, 1989, in Colorado. During the divorce proceedings the district court of the County of Arapahoe, Colorado, issued several orders which have been introduced into evidence in this case. The first, entered September 5, 1989, sets forth the following relevant factual findings: (1) the parties married on April 27, 1984, and separated in December of 1988; (2) the parties lived together for approximately eleven years even though they had been married for less; (3) "[d]ivision of much of the parties' marital property and personalty was agreed upon by way of a stipulation, which was made an order of Court on July 12, 1989"[1]; (4) both parties were employed throughout the marriage but, shortly before the divorce, Ms. Overton lost employment and suffered a deterioration in mental health to the point where she became suicidal and homicidal; (5) Ms. Overton had been unemployed since September, 1988, as a result of her mental illness which also caused her involuntary hospitalization from January 24 through February 14, 1989, and required her to undergo followup care for sixty days thereafter; (6) twelve days following her release from hospitalization, Ms. Overton returned home and found that the Debtor had changed the locks on their marital residence and totally depleted the parties' bank accounts even though the parties had established a practice of contributing equally toward their marital expenses; (7) the Debtor voluntarily terminated employment and moved to California in January 1989 to seek a better job opportunity, was unsuccessful, and returned to Pennsylvania in May 1989 to look for work; (8) Ms. Overton was being supported by members of her family, was capable of very limited employment at the time and would be unable to meet her own financial needs indefinitely; (9) Ms. Overton was paying for weekly

---

**1.** Neither the July 12, 1989, order nor the stipulation is part of the record before the Bankruptcy Court and no part of the property distribution is at issue.

therapy even though she had no health insurance coverage. The court concluded that Ms. Overton needed and was entitled to spousal financial support. *See* Exhibit 1.

The Colorado court also decided that the Debtor was capable of working, had made two major moves since January 1989 and was limiting his employment search to his chosen field. The court determined that Debtor had been living on marital assets although he was voluntarily unemployed as a result of his desire to avoid paying spousal maintenance. Debtor was ordered to pay temporary maintenance to Ms. Overton.

On October 11 and 12, 1989, the state court held a hearing concerning the request for permanent support and, on December 5, 1989, entered a permanent order regarding spousal maintenance which was introduced into evidence in the case at bench. The court's findings of fact are very detailed. They include the following: (1) Debtor was then forty-two years old, in good health, trained and employed as a mechanical designer with earnings of approximately $2,900.00 per month (gross income); (2) Ms. Overton was still unemployed and unemployable because of her mental illness. The Colorado court specifically credited expert testimony introduced by both parties and found that Ms. Overton suffered severe depression, was homicidal and suicidal, and, as a result, was unable to support herself through appropriate employment. Various orders dividing the personal property and proceeds of real estate sales between the parties were signed. The court also found that:

> ... while Petitioner [Debtor] was under a Court order to pay both temporary maintenance and Respondent's [Ms. Overton's] car payments, which Petitioner failed to pay despite his employment as a mechanical designer, Petitioner repayed [sic] a substantial loan to his mother in the amount of $3,700.00. As of the date of P.O. [Permanent Order] Petition-

er paid only $300.00 towards his obligation.

Exhibit 2 at ¶ 6.

In Paragraph 8 of the same order, the court set forth its determination of what payments constituted spousal maintenance as follows:

> The Court is bound by C.R.S. 1973, Section 14–10–114, as to the determination of maintenance herein. The Court finds that the amount of Respondent's [Ms. Overton's] property will not generate income, nor will same be sufficient to provide for the reasonable needs of Respondent. The Court further finds that Respondent is unable to support herself through appropriate employment, and that in this case, "appropriate employment" for Respondent is her former position as a piping designer. In arriving at the following maintenance award, the Court has considered: Respondent's financial resources, including the marital property apportioned to her, and her inability to meet her needs independently; the standard of living established by the parties during their marriage, which appears to have been good, in that the parties' combined gross annual income was more than $60,000.00; the duration of the parties' marriage, which the Court notes was relatively brief; Respondent's age (38), and her physical and emotional condition (the Court finds that Respondent is mentally ill, as supported by the testimony of the experts in this case); and Petitioner's [Debtor's] ability to meet his own financial needs while meeting those of Respondent, which ability the Court's [sic] specifically finds Petitioner to possess. Therefore, the Court orders as and for spousal maintenance, payable by Petitioner to or on behalf of Respondent, the following:
>
> A. Petitioner shall timely pay the entire First Bank Card (Master Card) debt of approximately $2,550.00 and the entire Commerce Bank (Car) debt of approximately $5,000.00, both of which are identified in Respondent's Affidavit with Respect to Financial Affairs, dated October 12, 1989;[2]

---

2. The Colorado court entered another order on December 13, 1989, which clarified the December 5 order to provide "The Petitioner [Debtor] shall pay for the Respondent [Ms. Overton] the

B. Until further Orders of Court, Petitioner shall pay to Respondent the sum of $750.00 per month, one-half of which is payable on the first day of each month, and one-half of which is payable on the fifteenth day of each month;

C. Petitioner shall timely pay Respondent's reasonable attorney's fees and costs; Respondent's counsel shall submit an affidavit regarding the attorney time and costs spent by him in this matter; Petitioner shall have fifteen (15) days within which to file an objection to same; if an objection is filed, a hearing will be set regarding the reasonableness of Respondent's attorney's fees and costs; if no objection is filed within said fifteen (15) days, judgement shall hereby enter forthwith in favor of Respondent and against Petitioner in the amount or amounts as set forth in said affidavit.[3]

D. The aforesaid payments are to be made through the Court Registry by way of a wage assignment, which the Court orders Petitioner to sign (and if the Petitioner fails to sign same, then the Court Clerk is directed to execute the said wage assignment in Petitioner's name and stead); and

E. The Court shall continue to retain jurisdiction in this matter and may modify and/or terminate said maintenance upon further motion of either party pursuant to the provisions of C.R.S. 1973, Section 14–10–122.

Exhibit 2.

Further, Paragraph 9 of the December 5, 1989, order determined that the Debtor had failed to pay temporary maintenance and automobile payments as previously ordered. *Id.* Judgment was entered in favor of Ms. Overton and against Debtor for $2,275.00, representing the two temporary maintenance payments and five motor vehicle payments of $335.00 each which had not been paid.

The parties agree that the temporary and permanent spousal maintenance payments of $750.00 per month and the arrearages are nondischargeable. However, they disagree as to whether the car and charge card payments and attorneys' fees are in the nature of support and maintenance and, therefore, whether they are nondischargeable. The parties agree that relief from the automatic stay should be granted only as to the obligations determined to be nondischargeable.

■ In *In re Gianakas,* 917 F.2d 759 (3d Cir.1990), the United States Court of Appeals for the Third Circuit delineated the factors a bankruptcy court should consider in determining whether an obligation arising from a marital dissolution is nondischargeable pursuant to 11 U.S.C. § 523(a)(5). They include: (1) the language and substance of the agreement in the context of the surrounding circumstances, using extrinsic evidence if necessary; (2) the parties' financial circumstances at the time of the settlement; and (3) the function served by the obligation at the time of the divorce or settlement. *Id.* at 762. Although *Gianakas* involved a property settlement agreement and these proceedings involve orders entered after litigation, we can perceive no reason to vary the factors to be examined except to the extent that there may be a preclusive effect through res judicata or collateral estoppel to the findings of the state court.[4] In this case the parties actually litigated the issue of support and the state court determined the facts, which this Court accepts, concerning the parties' circumstances as they existed at the time. Moreover, Debtor's testimony at the evidentiary hearing before us was an acknowledgement of many of the findings.

■ Of initial importance to the matter at bench is Debtor's contention that the

---

debt to First Bank MasterCard, and the debt to Commercial Federal Savings and Loan [for the car]; in all other respects, the permanent orders will remain the same."

**3.** On February 2, 1990, the court entered an order which determined that Ms. Overton's attorney's fees and costs in the amount of $10,-

000.00 were fair and reasonable and ordered the Debtor to pay those fees. The court entered judgment in favor of Ms. Overton.

**4.** This does not obviate our obligation to examine the legal conclusions to be drawn from those facts.

Court should examine facts which occurred after the support and maintenance order was entered. The law in this circuit is to the contrary. Only the circumstances and intent of the parties at the time of the award may be considered, and not changes in circumstances which may have occurred prior to and during the bankruptcy. *In re Gianakas*, 917 F.2d at 763; *In re Chedrick*, 98 B.R. 731, 734 (W.D.Pa.1989).

■ The relevant determination is that Ms. Overton required financial support and was unable to support herself at the time that the temporary and permanent orders were entered. The state court clearly intended that all of the items now at issue would constitute support and maintenance and specifically retained jurisdiction to consider modification or termination of the permanent order upon request by either party. We find that these obligations are actually in the nature of maintenance and support and will discuss each contested item separately.

THE SECTION 523(a)(5)(B) ANALYSIS

(1) *The car payments.* We find that Ms. Overton needed transportation for follow-up mental health care, to seek employment, and for other personal uses. She had no funds with which to make car payments because she was unemployable and Debtor had appropriated all marital assets. The Court of Appeals noted in *Gianakas*, that transportation is "indicative of a debt intended to be in the nature of support," because it "serves to maintain daily necessities." 917 F.2d at 763. This Court finds that transportation for Ms. Overton was "actually in the nature of . . . maintenance or support." 11 U.S.C. § 523(a)(5)(B). As such, Debtor's obligation to pay the $5,000.00 owed by Ms. Overton for her car is nondischargeable.

(2) *The charge card payments.* Concerning the obligation imposed upon the Debtor to pay Ms. Overton's credit card bill of approximately $2,550.00, we note that the state court determined that the payment would constitute spousal maintenance. *See* note 2 and accompanying text, *supra*. This finding was based on the fact that Ms. Overton had incurred the debt to supply herself with the necessities of life because Debtor's removal of marital assets prevented her from otherwise providing for her needs. The court's order directing Debtor to pay was one entered for the purpose of contributing to Ms. Overton's actual maintenance and support. As the Pennsylvania Superior Court stated in *Buccino v. Buccino*, 397 Pa.Super. 241, 580 A.2d 13, 21 (1990), "it is plain that the economic realities facing the parties at the time of the divorce favor the inference that the obligations imposed here constituted necessary support for the wife." The order was not intended to and did not divide property. Therefore, this obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(5)(B).

(3) *The attorney's fee.* The remaining issue concerns the order of the state court directing Debtor to pay Ms. Overton's counsel fees incurred in her effort to obtain temporary and permanent support and maintenance. Judgment was entered for Ms. Overton and the payments were to be made directly to her, not to her attorney. The issue is whether this obligation is actually in the nature of support or maintenance. The various courts which have addressed this issue have arrived at different results.

Some courts opine that "undertakings by one spouse to pay the other's debts, including a debt to a lawyer for fees, can be 'support' for bankruptcy purposes. So can periodic payments . . . even if the [divorce] decree labels these payments a 'property settlement.'" *In re Williams*, 703 F.2d 1055, 1057 (8th Cir.1983). The court in *Matter of Romano*, 27 B.R. 36, 38 (Bankr. M.D.Fla.1983), noted that "attorney's fees stand and fall with the primary debt", i.e., that the dischargeability of attorney's fees depends on whether the fees were based on services rendered in connection with the property settlement or with the support provision. The *Romano* court identified the majority rule to be that attorney's fees constitute support and are nondischarge-

able.[5]

Other courts have found the obligation nondischargeable, relying either upon a lack of evidence of intent that the repayment of fees was to be part of a property settlement or upon affirmative evidence that the dependent spouse's financial, health or other circumstances are such that the provision was intended to assist in meeting living expenses. In the latter case, the obligation has been found to be "so intimately connected with the original [support] order that [it] should be considered in the nature of alimony, maintenance and support." *In re Pollock*, 90 B.R. 747, 759 (Bankr.E.D.Pa.1988). *See also In re Spong*, 661 F.2d 6 (2d Cir.1981); *In re Snider*, 62 B.R. 382 (Bankr.S.D.Tex. 1986). *Compare Matter of Shaw*, 67 B.R. 911, 912 (Bankr.M.D.Fla.1986) (attorney's fees incurred by nondebtor spouse in litigating Debtor's right of child visitation are dischargeable). *See also* Scheible, *Defining "Support" Under Bankruptcy Law: Revitalization of the "Necessaries" Doctrine*, 41 VAND.L.REV. 1, 33–34 (1988).

In this case, the award against Debtor to Ms. Overton of her attorney's fees represented support and maintenance because without such an award Ms. Overton would have been unable to obtain or pay for legal representation in the pursuit of her support claims through the judicial labyrinth. *See* Gold, *The Dischargeability of Divorce Obligations Under the Bankruptcy Code: Five Faulty Premises in the Application of Section 523(a)(5)*, 39 CASE W.L.REV. 455, 463–64 (1988–89). Her attorney obtained an order awarding her spousal maintenance and support. The legal fees Ms. Overton incurred were necessary to her support and the court's order imposing payment upon Debtor was actually in the nature of support and maintenance within the meaning of 11 U.S.C. § 523(a)(5)(B).

## THE SECTION 523(a)(5)(A) ANALYSIS

Debtor argues, alternatively, that the charge card and car payments are dischargeable because the state court created an assignment of the obligation when it ordered Debtor to pay the creditors directly in lieu of paying Ms. Overton.[6]

The operative portion of § 523 is

(a) A discharge ... does not discharge an individual debtor from any debt (5) to a spouse, former spouse ... for ... maintenance for, or support of such spouse ... in connection with a divorce decree or other order of a court of record ... but not to the extent that—(A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise....

11 U.S.C. § 523(a)(5)(A).

■ The state court order at issue does not create an assignment. In order to create a legal assignment the majority rule states that there must be "a transfer or setting over of property, or of some right or interest therein, from one person to another." *In re Purman's Estate*, 56 A.2d 86, 88 (1948). *See also, Minshall v. Sanders*, 175 Okl. 1, 51 P.2d 940 (1936) (transfer the whole). However, the transfer must be "of the whole of any property ... or of some right or interest therein ... the transfer of one whole interest" must be effected. *Love v. Clayton*, 287 Pa. 205, 134 A. 422 (1926). *See also Kroeker v. State Farm Mutual Automobile Ins. Co.*, 466 S.W.2d 105, 109 (Ct.App.Mo.1971); *Cashman v. Bremer*, 206 Minn. 301, 306, 288 N.W. 732, 734 (1939). An equitable assignment consists of "[a]ny order, writing, or act by the assignor which makes an absolute appropriation of a chose in action or fund to the use of the assignee with the intention to transfer a present interest, although not amounting to a legal assign-

---

**5.** In *Romano*, the debtor and ex-spouse stipulated that the amounts were in the nature of alimony and support. *In re LaFleur*, 11 B.R. 26, 29 (Bankr.D.Mass.1981) held that where an attorney's fee award is part of a contempt action brought for failure to pay child support, the fees are support and are nondischargeable; all other attorney fee awards are dischargeable. *See also*

*In re Aughenbaugh*, 119 B.R. 861 (Bankr.M.D. Fla.1990) (attorneys' fees dischargeable because plaintiff failed to prove that they were in the nature of alimony or support) (collecting cases).

**6.** There is no contention that the attorney's fee obligation constitutes an assignment.

ment ... the assignor must not retain any control over the fund, any authority to collect, or any power of revocation." *In re Purman's Estate*, 56 A.2d at 88.

No interest was transferred by the state court order. The wife's right to payment on the Debtor's support debt (*i.e.*, her claim against him) remains with her. *See* 11 U.S.C. § 101(5) ("right to payment" is a "claim"). Section 523(a)(5)(A) requires that the support *debt* be assigned. This has not occurred. The debt, *i.e.*, Debtor's liability on the support claim, remains with him. *See*, 11 U.S.C. § 101(12). Thus no rights and obligations of either party have changed. The creditors' rights have not changed either. They still can pursue only Ms. Overton if Debtor fails to remit the payments and only Ms. Overton can enforce Debtor's obligation to pay under her support order. Debtor misconstrues the language of § 523(a)(5) of the Bankruptcy Code because Debtor confuses his support obligation to Ms. Overton with her obligations to the creditors.

Although in recent years courts have not often used § 523(a)(5)(A) to hold debts dischargeable, this was not always the case. In the early years after the enactment of the Bankruptcy Code, a few courts applied § 523 to discharge attorneys' fees and doctors' bills. *In re Crawford*, 8 B.R. 552, 553 (Bankr.D.Kan.1981); *In re Allen*, 4 B.R. 617, 620 (Bankr.E.D.Tenn.1980). They also held that the obligation was dischargeable if payments were not made directly to the dependent spouse. *See Stout v. Prussel*, 691 F.2d 859 (9th Cir.1982); *In re Daiker*, 5 B.R. 348 (Bankr.D.Minn.1980). Many of the early cases reviewed the legislative history and concluded that Congress intended to allow discharge of the debt to the spouse only when it was assigned to a state welfare agency.

The Congressional intent in enacting the assignment exception to the alimony, maintenance, or support exception to discharge was to cover the situation where a spouse, who is receiving welfare payments from a governmental agency, voluntarily, or by operation of law, assigns a debt for support or maintenance. 3 Collier On Bankruptcy Section 523.15(4)

(15th ed. 1980). The legislative history demonstrates that by enacting subsection (A) of Section 523(a)(5), Congress intended to make support-related liabilities owing to governmental entities such as the welfare department dischargeable ...

*In re Deblock*, 11 B.R. 51, 53 (Bankr.N.D. Ohio 1981). *See also In re French*, 9 B.R. 464, n. 6 (Bankr.S.D.Calif.1981); *In re Wells*, 8 B.R. 189, 193 (Bankr.N.D.Ill.1981); *In re Knabe*, 8 B.R. 53, 55 (Bankr.S.D.Ind. 1980); *In re Pelikant*, 5 B.R. 404, 408 (Bankr.N.D.Ill.1980). Congress counteracted this analysis in 1984, however, when it amended § 523(a)(5)(A) to state specifically that assignments to the Federal and State governments and their subdivisions are nondischargeable.

One early case which was decided in 1981 by the United States Court of Appeals for the Second Circuit took a unique approach to the assignment issue. *In re Spong*, 661 F.2d 6 (2d Cir.1981), involved a settlement agreement reached during a contested divorce in which the debtor agreed to pay his wife's legal fees. The Court of Appeals held that this was

... a paradigmatic third party beneficiary contract, which is not, and should not be confused with, an assignment. *See 2 Williston on Contracts* 815 (3d ed. 1959). In a third party beneficiary contract, benefits flow to both the promisee and the third party, and either may sue to enforce the contract. [Citations omitted]. If appellee [debtor] fails to satisfy his obligation to appellant [the attorney], the third party beneficiary, appellee will, at the same time, fail to satisfy his obligation to his wife, the promisee. If appellee satisfies his obligation to appellant, appellee will by the same act satisfy his obligation to his wife.

*Spong*, 661 F.2d at 10–11.

If there were an agreement between the parties in this case the Debtor's obligation would be nondischargeable under the *Spong* rationale. However, before us is not a contractual obligation but court-ordered payments of an ex-spouse's debts,

which payments Debtor must make directly to the creditor. Although we do not believe that Congress intended to create different treatment of a Debtor's court-ordered obligations and those of a contractual nature which arise from a divorce, we cannot characterize a court-ordered responsibility as one arising from a contract. Thus, the third-party beneficiary analysis is not applicable and we take a different tack.

An examination of § 523(a)(5)(A) reveals that what is dischargeable if assigned is the debt to the nondebtor spouse for maintenance or support, not the nondebtor's obligation to a third party, a matter over which this Court has no jurisdiction. First, we note that Ms. Overton's debts have not been assigned to anyone. She remains fully liable vis-a-vis her creditors. However, some courts have viewed obligations such as those herein to have been assigned and therefore as dischargeable. *Cf., Stout v. Prussel*, 691 F.2d 859, 861 (9th Cir.1982) (*citing In re Daiker*, 5 B.R. 348, 351 (Bankr.D.Minn.1980)) (debt must be payable directly to the spouse). We suggest that such cases misconstrue § 523(a)(5)(A) in the same way which Debtor does. In other words, where, as here, the trial court orders the husband, as part of his support and maintenance obligation to his wife, to make certain payments directly to the creditors, we hold that there has been no assignment within the meaning of § 523(a)(5)(A). Should the husband fail to pay as ordered, the wife is still liable to the creditors. The creditors have not obtained any rights of enforcement against the husband, rights which they would have received had there been an actual assignment. If he fails to pay only Ms. Overton can bring an action for support arrearages.

The state court's order designating the recipient of the payments was part of an overall support plan. The court was cognizant of Ms. Overton's mental illness and of the fact that but for Debtor's misappropriation of Ms. Overton's money, which prohibited her from using her own funds for daily necessities, she would not have incurred the charge card debts. The court found that those debts provided her with daily necessities at a time when Debtor owed her a duty of support and failed to provide financial help. Thus, the court decided, similarly to *Spong*, that Debtor could satisfy his support obligation to her by paying off the debts she had incurred as a result of his prior failure to pay her directly. When he pays the creditors, he will satisfy that portion of his support obligation to Ms. Overton, while satisfying her debt to the creditors. In essence, Debtor's one payment satisfies two separate and independent liabilities—one of which is Debtor's debt for support and one of which is Ms. Overton's charge card obligation. The court's order to Debtor merely directed how a portion of his support obligation was to be satisfied. Thus the prohibition on assignment of a support *debt* expressed in 11 U.S.C. § 523(a)(5)(A) is not applicable.

Because the charge card debt was incurred by Ms. Overton for necessities of daily living at a time when she needed and was entitled to support, Debtor's obligation to pay it is still actually in the nature of support. By requiring payment directly to her creditors, the state court ensured that Ms. Overton did not need to incur additional expense to pay for prior necessities nor be required to use future payments to pay for those in the past. The payment structure was designed to enable her to sustain her on-going daily requirements based on her needs at the time the state court entered the orders at issue herein. The reference point this court is required to examine is the circumstance as it existed when the support orders were entered. *In re Gianakas*, 917 F.2d 759 (3d Cir.1990).

We find that the court's intention was primarily to benefit Ms. Overton. Any benefit to her creditors is incidental and neither their rights nor the rights and liabilities of Debtor and Ms. Overton have been affected. It is Ms. Overton's interest which the Bankruptcy Code further protects in making support and maintenance awards nondischargeable. Accordingly, § 523(a)(5)(A) does not apply and the various components of Debtor's support and

maintenance obligation are not dischargeable.[7]

For the above reasons the Court finds that the obligation to pay temporary and permanent support, car payments, charge card payments, and attorney's fees are nondischargeable. Therefore, relief from stay will be granted to Ms. Overton to pursue her claim in state court.

An appropriate order will be entered.

---

**7.** We also note that the Permanent Order of December 5, 1989, required Debtor to make payments "for spousal maintenance ... to *or on behalf of*" Ms. Overton. Exhibit 2. An amendment to the order was made on December 13, 1989, after the court reviewed the court reporter's notes from the December 5, 1989, hearing to clarify that Debtor "shall pay for the Respondent [Ms. Overton] the debt to First Bank Mastercard, and the debt to Commercial Federal Savings and Loan...." Exhibit 4. The orders are evidence that the payments were intended to be support and there is nothing in the state court record or the record in this case to indicate the contrary.